Samuel C. Coleman, J.
Plaintiff, a shoe manufacturer, sues for an injunction (and accounting) to restrain the defendant from manufacturing and selling a shoe, which, he says, is a copy of the one he furnished the defendant for the latter to determine whether it would manufacture it for the plaintiff. The shoe, the plaintiff says, embodies a new idea in shoe construction (a soft-soled ladies’ shoe for street wear); the idea was his, and the defendant, after informing the plaintiff that it would be inexpedient for it to manufacture the shoe for the plaintiff’s account, proceeded to do so on its own account. “ The plaintiffs generally,” its brief says (I use the singular) “base their right to relief on the claim that the defendant obtained its knowledge of the process by which soles are made from the plaintiffs in confidence, and that defendant’s use of that knowledge for its own benefit in competition with the plaintiffs is a breach of such confidence and indeed of defendant’s express agreement not to do so.”
*196 If we assume that, as one of the defendant’s witnesses put it (I paraphrase): the construe'don of the sole was interesting and technically the shoe was a challenging one and that the plaintiff possessed something unique, nevertheless, as the plaintiff had already marketed the shoe when.he showed it to the defendant, there was no “ secret ” — no breach of confidence in betraying or misusing a “ secret ” and the plaintiff has no complaint.
The plaintiff had had constructed for him in England a ladies’ shoe for street wear which possesses certain pleasing characteristics. The sole, the portion of it that touches the ground, is made of leather usually used only in uppers and is attached to the upper in such a way as to give the appearance of a solid unit. And the sole of course may be of the same color as the upper. The sole itself has several components to give it strength and resiliency. As to these components the plaintiff cannot claim any right.
The plaintiff began taking orders for the shoes from its own samples in September and October, 1960; the shoes were exhibited at the industry’s shoe fair in October, 1960; the first order, a small one, was ‘‘ rushed out ’ ’ to Lord & Taylor in January, 1961 so as to be included in the store’s ‘ ‘fashion catalogue ”; by February 23, that store had received over 800 pairs; between February 15 and March 1, over 2,000 pairs had been shipped to Saks Fifth Avenue; and by that date, March 1, a total of 4,000 to 5,000 pairs had been delivered to retail stores and department stores in New York, and elsewhere, including a shipment of over 500 pairs to a chain of retail stores in Chicago selling high-priced shoes, and 35 pairs to a retail store in New Rochelle, whose owner was connected with the plaintiff. All these shoes had been manufactured for the plaintiff in England. On March 6, Monday, a Lord & Taylor advertisement of the shoe appeared in the New York Times (almost full page). On the previous Saturday, the plaintiff gave a pair of the shoes to an employee of the defendant Herrmann,, who with his wife, by chance, was in the New Rochelle store. The shoes were already on sale in that store and they were shown to Herrmann, apparently at first, in a casual manner, to exhibit one’s wares, perhaps proudly, and then, to ascertain whether Herrmann’s firm, the defendant, would be interested in manufacturing them for the plaintiff. The plaintiff says the shoes were shown in confidence and that Herrmann acquiesced in the request that the defendant was not to manufacture them for itself. It is this confidence — this secrecy which the plaintiff says the defendant violated when it did manufacture them for itself.
*197 But there was no secret and nothing was imparted in confidence. The shoe industry had already seen the shoe (Herrmann’s superior, Simon, saw the Lord & Taylor advertisement, the same day he saw the shoe). And, indeed, anyone was free to copy it in the sense that the shoe was the finished product — sold in the open market — and because any competent shoe manufacturer applying conventional shoe manufacturing procedures was in a position to reproduce the very product. There was no special process involved not immediately discernible to anyone. There was no “ secret ” and no “ secret process ” to impart. No technical information as to the making of the shoes was given to the defendant and it needed no such information.
But there was breach of confidence, says the plaintiff. ‘ ‘ Whether or not,” plaintiff says in its brief, “if defendant had purchased one of plaintiffs’ shoes at retail and by studying the construction found out how to make it and thereafter made and sold it, such making and selling would be authorized, we need not now determine since that is concededly not the case here.” That is so, argues the plaintiff, because whatever anyone else may do, defendant acquired its knowledge for a limited purpose, and cannot use it to the plaintiff’s detriment. But is this not so only in a case where there is a “secret” and improper use of it? And there is no secret where what is copied or taken is in the open. An employee may not avail himself of a “ secret ”, obtained in the course of his employment — the secret is within the family — a competitor pretending co-operation may not competitively make use of a “ secret ” — a secret process, for example, disclosed in the course of negotiations, or in the course of business dealings. Moulds or patterns supplied for a limited purpose cannot be used for another purpose. But if the case is one only of asking a manufacturer if he will manufacture for you a commodity that by hypothesis anyone can make, since it is already on the market, there is no secret, no confidence and no confidence broken.
Does the statement that the defendant will not compete if it will not make the shoe for the plaintiff add to the plaintiff’s case? I do not think it does. Assuming that a manufacturer would be held to an undertaking not to compete as a condition to being invited to consider manufacturing a commodity, there was no such undertaking here. The shoes were already on sale in the New Rochelle store, as they were elsewhere, a pair was shown to Herrmann to see what he thought about it, the talk turned on the possibility of the defendant’s making the shoe, and it was not until the very end that the plaintiff received the defendant’s assurance. By that time Herrmann knew all about *198 the shoe and the plaintiff would be forestalling a competitor merely by displaying his wares to that competitor, and perhaps to others in succession and so obtaining a monopoly to which he was not entitled. In conventional terms of contract, I should say that there was no consideration for Herrmann’s statement.
I believe the plaintiff is aware of the weakness in his case in this respect for he makes much of the information as to “ tests ’ ’ imparted to the defendant. He would have me believe that this was the “ secret ”. But this “ secret ” was nothing more than a statement that “ tests ” had been made as to the durability of soft upper leather used as the bottom of the sole, that some persons in the factory in England had worn the shoes and tried them out for durability. The plaintiff says he asked Herrmann not to disclose the fact of these “tests” to anyone. But (1) these were simple “ tests ” anyone could apply (the long period of experimentation in England was caused by changes in construction and design and not because of “ tests ”); (2) the plaintiff had already told Lord & Taylor about the “ tests ” “in confidence”; (3) although he denied telling other customers about the “ tests ”, he assured Herrmann when the latter inquired about “ durability ” that he had sold the shoes to Lord & Taylor, Saks Fifth Avenue and chain stores; that he had had their “ reactions ” and that “ we are selling with our corporation taking the risks and we are not concerned” — a statement that makes incredible testimony that he withheld from his customers information about “tests”. A good salesman with a new product would proclaim these “tests” and the plaintiff was confiding no ‘ ‘ secret ’ ’ when he talked about them to Herrmann. As to Lord & Taylor, the plaintiff told Herrmann about that store’s advertisement in the New York Times, which said that the shoes had been designed “ to wear and wear and wear ”.
On the question of secrecy and disclosure, whether relating to the construction of the shoe or to the nature of the ‘ ‘ tests ’ ’ I should add that before defendant began offering its “ copy ” of the plaintiff’s shoe and while negotiations with the defendant were still proceeding, plaintiff opened up similar negotiations with a large shoe manufacturing firm in St. Louis and made similar disclosures as to shoe construction and “ tests ” “in confidence ” to that firm and had told that firm of his “ confidential disclosures ” to the defendant. Indeed he went further in his disclosures to the St. Louis firm than he did to the defendant. I say that these negotiations were somewhat concurrent as the plaintiff testified they went on over a period of six months and they seem to have terminated by August, 1961 when the plaintiff filed a patent application. It is significant that when *199 the St. Louis firm asked the plaintiff what protection it could give against a manufacturer who might make the same shoe he replied (again I paraphrase) that “ all we could offer was the probability of getting a patent ’ ’ — recognition enough in such circumstances of the absence of any protection for copying. I revert to the matter of forestalling that would result by the successive showing to competitors “ in confidence ” of a product already in the open.
So far I have assumed that the plaintiff’s shoo was unique and that it could not be copied with impunity. I have said that the shoe has pleasing characteristics, but I am not satisfied that those characteristics, singly or in combination, were absent from other forms of footwear. The testimony is plain that the transition from “ house slipper ”, to “ play shoe ”, to “ casual shoe ” to “ street shoe ” is a gradual one, that the characteristics of one appear in the other, that ‘1 house slippers ’ ’ tend to become more “formal” and to take on the appearance of ‘ ‘ street shoes ’ ’ and that there is a reverse process. The plaintiff conceded that a gold slipper on the market at least by Thanksgiving 1960 was “ close in almost every respect and if there were a little more foam [in the sole] would be very close to ours that if his very sole had been used in “ house slippers ” he could not complain; nor if used in “ casual shoes ”. I stated in the beginning that the plaintiff could not claim any “ trade secret” as to the component parts of the sole. His complaint is that none of these characteristics had been used in “ street shoes ”. But even if he were right ■ — • others were already selling them — his sole complaint against defendant is breach of confidence for making use of a “secret” — there was no “ secret ” and no “ confidence ” and the complaint is dismissed.